# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EUGENE ZOGLIO,

       *Plaintiff*,

  v.

STEVEN T. MNUCHIN,

       *Defendant*.

Civil Action No. 17-1594 (TJK)

## MEMORANDUM OPINION

In 2017, the Office of D.C. Pensions ("ODCP"), an office within the Department of Treasury, denied Plaintiff Eugene Zoglio's request to reestablish a decades-old disability pension. He has brought suit against the Secretary of the Treasury (the "Secretary") seeking reversal of that denial. The parties have cross-moved for summary judgment. ECF Nos. 9, 11.[1] For the reasons set forth below, the Secretary's motion will be granted and Zoglio's motion will be denied.

## I. Statutory and Regulatory Background

As far back as 1916, Congress created retirement plans for police, firefighters, and other employees of the District of Columbia (the "District"). *See* S. Rep. No. 96-237, at 2 (1979). These plans "were funded on a 'pay as you go' basis," and by the 1970s they had created a vast "unfunded liability" for the District. *D.C. Ret. Bd. v. United States*, 657 F. Supp. 428, 430 (D.D.C. 1987). In 1979, Congress enacted the District of Columbia Retirement Reform Act, Pub. L. No. 96-122, 93 Stat. 866 (1979), in the hopes of providing "adequate funding" to these

---

[1] In considering the instant motions, the Court has relied on all relevant parts of the record, including: ECF No. 9-1 ("Pl.'s Br."); ECF No. 10 ("Def.'s Br."); ECF No. 12 ("Pl.'s Reply"); ECF No. 14 ("Def.'s Reply"); ECF No. 15 ("JA").

"financially strapped" programs. *McNeal v. PFRRB*, 488 A.2d 931, 934 (D.C. 1985).

Nonetheless, by 1997, these unfunded liabilities had increased to $4.8 billion, and associated

payments constituted 10% of the District's annual revenue. *See* Balanced Budget Act of 1997,

Pub. L. No. 105-33, tit. XI, subtit. A, District of Columbia Retirement Protection Act of 1997

§ 11002(a)(2), (6), 111 Stat. 251, 715-16.

Congress responded by passing the District of Columbia Retirement Protection Act of

1997 ("DCRPA") (enacted as Title XI, Subtitle A of the Balanced Budget Act of 1997), which

transferred the obligation to pay for certain of these retirement programs to the federal

government. *Id.* § 11002(b)(2), 111 Stat. at 716.[2] These programs were transferred "as in effect

on the day before" the statute's "freeze date" of June 30, 1997. DCRPA § 11003(5), (9), 111

Stat. at 717. That is, the federal government took on the District's liabilities that had accrued

under these programs on or before June 30, 1997, with the District continuing to be responsible

for liabilities arising from employee service rendered after that date. *See id.* § 11012(b), 111

Stat. at 718; *Rivera v. Lew*, 949 F. Supp. 2d 266, 267 (D.D.C. 2013); Federal Benefit Payments

under Certain District of Columbia Retirement Plans, 70 Fed. Reg. 60003, 60003 (Oct. 14,

2005).

Congress vested the administration of the DCRPA in the Secretary, *see* DCRPA

§ 11083, 111 Stat. at 730, who delegated that authority to the ODCP, *see* Def.'s Br. at 1-2. In

particular, the Secretary may promulgate procedures for handling claims. DCRPA § 11022(a),

111 Stat. at 720. The relevant regulations provide for the processing of claims by a "Benefits

Administrator," 31 C.F.R. § 29.404(a), a role apparently filled by the District of Columbia

---

[2] The DCRPA was subsequently amended by the District of Columbia Retirement Protection
Improvement Act of 2004, Pub L. No. 108-489, 118 Stat. 3966, which renumbered certain
sections of the DCRPA. This Opinion uses the original section numbers.

Retirement Board ("DCRB") during the time period relevant to this case, *see* Def.'s Br. at 6. In the event that a claim is denied, the decision must be accompanied by "adequate written notice of such denial, setting forth the specific reasons for the denial in a manner calculated to be understood by the average participant." DCRPA § 11022(a)(1), 111 Stat. at 720. Applicants may seek reconsideration before the Benefits Administrator, followed by an appeal to the Department of the Treasury. 31 C.F.R. § 29.404(b)-(e). *See generally Vincent v. Geithner*, 890 F. Supp. 2d 8, 10 n.1 (D.D.C. 2012) (discussing review process).

The DCRPA gives this Court exclusive jurisdiction and venue to review benefits decisions. DCRPA § 11072(a)(1), 111 Stat. at 728. It also sets out a standard of review. "Any factual determination made by the [Secretary] shall be presumed correct unless rebutted by clear and convincing evidence." DCRPA § 11022(b), 111 Stat. at 721. Moreover, the Secretary's "interpretation and construction of the benefit provisions of the [transferred retirement programs] and [the DCRPA] shall be entitled to great deference." *Id.*

## II.     Factual and Procedural Background

In 1958, Zoglio became an officer in the District's Metropolitan Police Department. JA 1. In 1970, he retired with a disability annuity. JA 1-2. Zoglio subsequently attended law school and started his own practice. JA 2. In 1984, the Police and Firefighters' Retirement and Relief Board ("PFRRB") terminated Zoglio's pension, on the ground that his earning capacity had been restored by his "lucrative" law practice. JA 269, 279. Of particular note, the PFRRB concluded that Zoglio's "earning capacity" included not just the personal "income" he had actually drawn from his firm (which was incorporated as a professional corporation), but also his "demonstrated capacity to earn" based on the firm's revenues. JA 280-82

In 1991, Zoglio petitioned the PFRRB for reestablishment of his annuity. *Zoglio v. PFRRB* ("*Zoglio I*"), 626 A.2d 904, 905 (D.C. 1993). He argued that, by virtue of having turned

50, he was necessarily entitled to reestablishment. *Id.* The District of Columbia Court of Appeals rejected this argument, holding that District law recognized only "two corresponding conditions upon which the annuity, once terminated, can be 'reestablished': recurrence of the disability and reduction of income below the statutory percentage ceiling." *Id.* The Court of Appeals also rejected Zoglio's theory that the disability program discriminated against him based on his age. *See id.* at 907-08.

In December 2014, Zoglio again sought reestablishment of his annuity, this time on the ground that his earning capacity had declined to less than 80% of the position he held at his retirement. JA 268. There followed a series of administrative decisions that both parties agree were erroneous. *See* Pl.'s Br. at 6; Def.'s Br. at 6 n.7. The DCRB interpreted his request as one for "deferred retirement benefits," JA 267, and granted him such benefits in the amount of $631 per month, JA 261. This decision was incorrect because Zoglio had neither requested, nor was he entitled to, deferred benefits. *See* Def.'s Br. at 27. The DCRB promptly reversed course and voided the award, suggesting he instead seek relief from the PFRRB. JA 260. That suggestion was also in error, because the PFRRB lacked jurisdiction over his case and promptly dismissed it. JA 249, 254.

In September 2015, Zoglio returned to the DCRB with a renewed request for reestablishment, explaining the previous errors. JA 252-53. On October 30, 2015, DCRB denied the request. JA 248. It reasoned, first, that he had failed to show that his "earned income for [calendar year] 2014 was below the statutory earnings threshold." JA 249. It noted that Zoglio continued to maintain the "lucrative law practice" that underlay the PFRRB's 1984 decision to terminate his benefits. *Id.* It also concluded that Zoglio had misled the PFRRB about

his income in the earlier proceedings, and that this "materially false information" had caused his annuity to be "forfeited." JA 249-50.

On November 24, 2015, Zoglio appealed the denial to ODCP. JA 101-02. He argued that the "only relevant issue" was his "2014 earned income." JA 106. While acknowledging that "he and his wife had adjusted gross income of $162,820" in 2014, he explained that most of this amount (including certain retirement benefits and payments from a purchased annuity) did not count toward his "earned income." JA 113. He also claimed that his tax return did "not show any income from his 'lucrative' law firm in 2014 because his law firm did not make a profit in 2014 and he received no salary or other earned income from the firm in 2014." JA 114. His wife continued to work at the firm, but her salary had been reduced from $35,000 to $25,000. *Id.* He also disputed the DCRB's conclusion that he had previously misled the PFRRB. JA 96, 114-15.

ODCP followed up with two requests for additional information. First, it requested additional tax documents and a description of any "services performed in 2014 and 2015 by Mr. Zoglio on behalf of" his firm. JA 94. Zoglio provided the tax documents, along with the following explanation:

> Mr. Zoglio did not actively engage in the practice of law in 2014 and 2015 for the firm he founded many years ago, Eugene M. Zoglio, P.A. He is almost 80 years old. As to the services performed by Mr. Zoglio in 2014 and 2015, they are as follows: He occasionally writes checks for routine bills for the firm and the attorneys will on occasion consult with him, for which he receives no salary. All legal work and fees generated by the firm are done by the other attorneys and paralegals. Mr. Zoglio's wife has done administrative work for the firm for the past 30 years as an employee of the firm, for which she receives a salary of $25,000 per year. Mr. Zoglio's income from investments, sales of real estate, pensions, annuities, Social Security and rent from real property does not disqualify him from restoration of the disability pension to which he is entitled by law.

JA 15.

Next, ODCP requested medical documentation showing that Zoglio "is currently suffering from the disabling illness/injury he incurred while employed by the Metropolitan Police Department prior to his disability retirement, and that this has caused a reduction in his earnings capacity below the statutory threshold." JA 11. Zoglio refused to provide this information, which he argued was "not relevant to the legal issue to be decided regarding the reinstatement of his annuity." JA 9. He argued again that "[t]he only relevant issue regarding restoration of [his] annuity is whether his earned income for 2014 fell below the 80% statutory limitation." *Id.* "Thus," he argued, "ODCP has all the relevant information it needs to make a decision." *Id.*

On March 24, 2017, ODCP denied Zoglio's appeal, on two grounds. JA 1-8. It concluded that Zoglio was required to establish that he continued to suffer from his disability, but had refused to do so. JA 4-6. It further concluded that Zoglio had failed to establish that his "earning capacity" had declined below the threshold required to reestablish his annuity. JA 6-8. ODCP's conclusion about earning capacity rested, in turn, on two independent bases. ODCP reasoned, first, that "earned income" is not necessarily identical to "earning capacity," which is the relevant standard under the statute. JA 6-7.[3] In particular, it reasoned that "an annuitant who at one point was entitled to a disability annuity under the Plan but is now capable of gainful employment cannot draw a disability annuity by simply choosing not to work." JA 7. It concluded that, "[b]y all indications, Mr. Zoglio's reduction in earned income is the result of a

---

[3] In its March 2017 decision, ODCP used the term "earned income" in place of the phrase "income of the annuitant from wages or self-employment" used in D.C. Code § 5-714(a)(2). *See* J.A. 6 n.3. In their briefing before the Court, the parties appear to have adopted this short-hand as well. *See, e.g.*, Pl.'s Br. at 9-10; Def.'s Br. at 19. For clarity, in its analysis below the Court will likewise use "earned income" when referring to the above-mentioned phrase in the statute.

voluntary decision to retire." *Id.* Zoglio admitted that he sometimes consulted with attorneys at his firm, which in ODCP's view suggested he had the ability to work. *Id.* And "nothing in the documentation provided suggests Mr. Zoglio lacks such ability." *Id.* As to its second basis, ODCP also reasoned that "a reduction in ability to earn income for reasons unrelated to the disability is not sufficient to show a lack of earning capacity." *Id.* And ODCP concluded that Zoglio had not shown that his disability had caused his decline in earning capacity. *Id.*

On August 8, 2017, Zoglio filed the instant lawsuit challenging ODCP's decision. ECF No. 1. He primarily attacks ODCP's legal reasoning. As in his briefing to ODCP, Zoglio argues that "[t]he only relevant issue is whether [his] earned income 'from wages or self-employment or both' for 2014 fell below the 80% earned income limit imposed by D.C. Code § 4-620(a)(2) (1981)." Pl.'s Br. at 2. Because the tax information he submitted to ODCP established this fact, he was entitled to reestablishment of his disability annuity. *Id.* He also argues that the government has acted in "bad faith," as evidenced by its initial mishandling of his claim. Pl.'s Reply at 21. Further, he argues that ODCP has discriminated against him based on his age, *see* Pl.'s Br. at 19-21; Pl.'s Reply at 19-20, and that he is being "singled out for special negative treatment" merely because he previously had a successful law practice, Pl.'s Reply at 2-3.

The Secretary argues that ODCP correctly denied Zoglio's application. He argues that Zoglio's income was not adequate evidence of his "earning capacity" for the reasons set forth in ODCP's opinion, and that Zoglio's annuity could not be reestablished absent evidence that he was still disabled. Def.'s Br. at 13-25. The Secretary also urges the Court to reject Zoglio's arguments about bad faith and age discrimination. *Id.* at 26-27.

## III.    Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). The Secretary has argued that the standard of review in this case is provided by the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq. See* Def.'s Br. at 7-10. He notes that DCRPA provides its own standard of review, but suggests, citing *Rivera v. Lew*, 949 F. Supp. 2d 266 (D.D.C. 2013), that there is no meaningful difference between the APA standard and the DCRPA's standard under the facts of this case. *See* Def.'s Br. at 9 & n.10. Zoglio does not argue for a different standard of review, and so the Court will apply the APA standard to this case.

"[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "The 'entire case' on review is a question of law." *Id.* "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Alston v. Lew*, 950 F. Supp. 2d 140, 143 (D.D.C. 2013).

## IV. Analysis

Both parties seem to agree that this case turns on an issue of statutory construction. *See* Pl.'s Br. at 2; Def.'s Br. at 10-13. The relevant statute is D.C. Code § 4-620 (1981), which, as of June 30, 1997 (the "freeze date" in the DCRPA), governed the termination and reestablishment of disability annuities for District police and firefighters. That historical statute governs this case because the retirement plans transferred to the Secretary were frozen in place as of June 1997. *See* DCRPA § 11003(5), 111 Stat. at 717. Nonetheless, the parties appear to agree that the current version of the statute, now found at D.C. Code § 5-714, is not materially different from the one in effect in 1997. *See* Pl.'s Br. at 9; Def.'s Br. at 10 n.11. The Court will cite the current version for the sake of convenience.

The relevant portion of the statute provides as follows:

(a)(1) If any annuitant retired under § 5-709 or § 5-710, before reaching the age of 50, recovers from his disability or is restored to an earning capacity fairly comparable to the current rate of compensation of the position occupied at the time of retirement, payment of the annuity shall cease:

> (A) Upon reemployment in the department from which he was retired;
>
> (B) Forty-five days from the date of the medical examination showing such recovery; [or]
>
> (C) Forty-five days from the date of the determination that he is so restored . . . .

(2) Earning capacity shall be deemed restored if, in each of 2 succeeding calendar years in the case of an annuitant who was an officer or member of the United States Park Police force, United State Secret Service Uniformed Division, or the United States Secret Service Division, or in any calendar year in the case of an annuitant who was an officer or member of the Metropolitan Police force or the Fire Department, the income of the annuitant from wages or self-employment or both shall be equal to at least 80% of the current rate of compensation of the position occupied immediately prior to retirement. *Nothing in this section shall preclude such member from having an annuity reestablished if his disability recurs, or when his earning capacity is less than 80% of the rate of compensation of the position occupied immediately prior to retirement for any full year thereafter*; provided, that whenever any member is reinstated with his respective department it shall be at the same grade or rank held by the member at the time of his retirement.

D.C. Code § 5-714(a) (emphasis added).

Zoglio argues that he is entitled to reestablishment of his benefits under the italicized text because his income has fallen below the statutory threshold of "80% of the rate of compensation of the position occupied immediately prior to retirement." *Id.*; *see* Pl.'s Br. at 7. While the statute refers to "earning capacity," not "earned income," he argues that they are one and the same. Pl.'s Br. at 7. The Secretary has offered three independent reasons for rejecting Zoglio's interpretation. First, the Secretary argues that, regardless of Zoglio's "earning capacity," he was

required to show that he continued to be disabled to merit reestablishment. Def.'s Br. at 13-18. Second, the Secretary asserts that "earning capacity" does not simply mean income, but the *ability* to earn income, such that someone "capable of gainful employment cannot draw a disability annuity by simply choosing not to work." *Id.* at 22. And by relying solely on evidence of his income, Zoglio did not meet his burden of showing that his "earning capacity" had fallen below the statutory threshold. Third, the Secretary asserts that to be cognizable under the statute, any decline in earning capacity must be the result of the annuitant's disability. *See id.* at 23-25.

The Court will focus on the Secretary's second theory, because if correct it offers a sufficient basis for upholding ODCP's decision to deny reestablishment of Zoglio's annuity. As explained below, the Court concludes that the Secretary reasonably interpreted the statute to mean that Zoglio's proffered evidence of his "earned income" was insufficient to establish a loss of "earning capacity" in this case, since he may have made a voluntary choice to stop working. Therefore, the Court need not address the Secretary's first and third theories.

As an initial matter, the Court must determine whether the Secretary's statutory interpretation is entitled to deference. The Court notes that this case is somewhat unusual in that the subject matter to be interpreted is not a federal statute, but a retirement plan governed by a District statute that has been frozen in time as of June 1997. This raises the issue of whether District law or federal law should control what, if any, deference to be afforded the Secretary's interpretation. The Court concludes it need not decide the issue, because both require sufficient deference to easily justify the Secretary's interpretation. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) (noting that, when faced with ambiguity, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency"); *Zoglio I*, 626 A.2d at 906 ("[C]ourts should give great

weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute." (quoting *McMullen v. PFRRB*, 465 A.2d 364, 366 (D.C. 1983) (per curiam)).

The Court starts with the language of the statute. The statute authorizes reestablishment "when [the annuitant's] *earning capacity* is less than 80% of the rate of compensation of the position occupied immediately prior to retirement for any full year thereafter." D.C. Code § 5-714(a)(2) (emphasis added). "Earning capacity" means a "person's ability or power to earn money, given the person's talent, skills, training, and experience." *Earning Capacity*, Black's Law Dictionary (10th ed. 2014). As the Secretary points out, the *ability* to earn money will not always be equal to actual income. *See* Def.'s Br. at 19-20. That is most obviously true when someone can work, but chooses not to. Thus, the plain language of the statute supports the Secretary's interpretation.

The text also contains another indication that "earning capacity" and "income" are not always the same. It provides that:

> Earning capacity *shall be deemed* restored if, . . . in any calendar year . . . , the income of the annuitant from wages or self-employment or both shall be equal to at least 80% of the current rate of compensation of the position occupied immediately prior to retirement.

D.C. Code § 5-714(a)(2) (emphasis added). That is, for purposes of terminating a disability annuity, an increase in income may be "deemed" sufficient to establish restoration of earning capacity. "Deem" means "[t]o treat (something) as if (1) it were really something else, or (2) it has qualities that it does not have." *Deem*, Black's Law Dictionary (10th ed. 2014). The fact that under the statute income is, in some contexts, "deemed" sufficient to establish earning capacity strongly suggests that, in other contexts, income may *not* be the same as earning capacity. *Cf. Dwight v. Merritt*, 140 U.S. 213, 218 (1891) (noting that the "phrase 'nothing shall

be deemed scrap-iron except,' etc., clearly shows that there might be other classes or kinds of scrap-iron known to the trade than those mentioned . . . under that clause of the statute"). Moreover, the "shall be deemed" provision is carefully cabined: it merely states that, if an annuitant's income rises above a certain threshold, then his "earning capacity" is "deemed restored" and the annuity must be terminated. The statute does not provide that an income above the threshold is *necessary* to terminate benefits, leaving open the possibility of showing by other means that earning capacity has been restored. And the "shall be deemed" language has no application whatsoever in the context of reestablishing benefits (the issue in this case), strongly implying that earning capacity and income differ in that context, as well.

Prior administrative decisions of the PFRRB provide additional support for the principle that "earned income" and "earning capacity" are not always the same. Indeed, the PFRRB adopted this position in Zoglio's case in 1984. There, the PFRRB considered whether Zoglio's annuity should be terminated because he had been "restored to an earning capacity fairly comparable to the current rate of compensation of the position occupied at the time of retirement." D.C. Code § 5-714(a)(1); *see* JA 273. Zoglio argued that the PFRRB could consider only his personal income, not the revenues of his law firm, in determining his "earning capacity." JA 286-89. The PFRRB noted that Zoglio was "the sole owner, director, officer and shareholder" of the firm, and that a "substantial portion of the [firm's] income . . . is generated by and derived from [his] work product." JA 273. It concluded that a portion of the firm's income could be attributed to Zoglio individually. *See* JA 281. The PFRRB also reasoned, "[i]n the alternative," that "comparable earning capacity is the *ability to earn and engage in gainful activity*." *Id.* (emphasis added). Thus, even if the law firm's income was not strictly speaking

Zoglio's income, it still contributed to his earning capacity because he had control over the assets of the firm.  *See id.* at 281-82.

Another PFRRB decision, from 2013, further supports the Secretary's interpretation.  In that case, the PFRRB concluded that an annuitant was "ineligible to receive disability retirement benefits if he reduced his income for reasons unrelated to his disability."  JA 299.  To be clear, the Court is not passing on the Secretary's theory that disability must be the reason for any cognizable decline in earning capacity.  Nonetheless, this decision bolsters the general proposition that "earning capacity" cannot be equated with "earned income."

The Secretary's interpretation also finds support in District cases interpreting other workers' compensation statutes.  Those cases recognize the principle that "actual wage-loss is significant as the best evidence of loss of earning capacity, but obviously some adjustment based on what the worker is 'able to earn' must be made."  *Dent v. D.C. Dep't of Emp't Servs.*, 158 A.3d 886, 902 (D.C. 2017) (quoting Arthur Larson, *The Wage-Loss Principle in Workers' Compensation*, 6 Wm. Mitchell L. Rev. 501, 525 (1980)).  In particular, lost wages may not be good evidence of lost earning capacity when the "claimant has voluntarily limited his earnings." Larson, *supra*, at 525.  For example, in *Powers v. District of Columbia Department of Employment Services*, 566 A.2d 1068 (D.C. 1989), the petitioner had injured his back and continued working on lighter duty at the same rate of pay.  *Id.* at 1068.  He then voluntarily left for a new job with higher pay, but soon had to quit because his new duties "were too rough on his injured back."  *Id.*  He was unemployed for five months before he found another job, and sought workers' compensation benefits for that five-month period.  *See id.*  His request was denied.  *Id.*  The District of Columbia Court of Appeals upheld that decision, reasoning in part that his "departure from his [former] job . . . voluntarily entail[ed] a risk of wage diminution as a

result of subsequent events." *Id.* at 1069. Thus, if income declines due to a worker's voluntary decision to quit, his or her "earning capacity" may remain unchanged.

Based on all the above, the Court easily concludes that the Secretary's interpretation of D.C. Code § 5-714(a) was reasonable, to say the least.

Zoglio argues that this interpretation was incorrect and that "earning capacity" always means "earned income" under the statute. But his arguments cannot carry the day.

First, Zoglio relies heavily on the "shall be deemed" provision in D.C. Code § 5-714(a)(2), arguing that it "defines 'earning capacity' as 'income of the annuitant from wages or self-employment or both.'" Pl.'s Br. at 9. But as explained above, he is mistaken: this provision in fact works against his interpretation of the statute. His interpretation is not even consistent with a prior decision in his own case. In 1984, the PFRRB concluded that Zoglio's "earning capacity" had been restored even if his "relevant income" had not been. JA 281-82.

Next, Zoglio points to language in opinions of the District of Columbia Court of Appeals that appear to equate "earning capacity" and "earned income." Pl.'s Br. at 10-11. And in fact, some of this language does seem to support his position at first blush. In *Roberts v. PFRRB*, 412 A.2d 47 (D.C. 1980), the court held that the statute "must be construed to allow an annuitant to petition the Board for reestablishment of annuity as soon as his *gross income* has fallen below the eighty percent level for any full year." *Id.* at 51 (emphasis added). In *McMullen v. PFRRB*, 465 A.2d 364 (D.C. 1983) (per curiam), the court held "that there is one standard for determining restoration to earning capacity," namely when "*earned income* reaches or exceeds the 80% limitation." *Id.* at 366 (emphasis added). In *Ridge v. PFRRB*, 511 A.2d 418 (D.C. 1986), the court held that the petitioner "was entitled to reestablishment of his disability annuity retroactive to . . ., the first date of the year following that in which his *income* fell back below the 80%

eligibility limit." *Id.* at 429 (emphasis added). And in *Zoglio I*, the court concluded that an annuity can be reestablished upon "reduction of *income* below the statutory percentage ceiling." 626 A.2d at 905 (emphasis added).

Nonetheless, the Court is persuaded by the Secretary's argument that this language is dictum insofar as it suggests that "earning capacity" is always the same as "earned income." Def.'s Br. at 21-22. "If a court in reaching a decision has not considered a particular point, then the connection of the decision with that point is not a connection of effect and cause, but is purely accidental, and as to that point the decision is no authority whatever." *Umana v. Swidler & Berlin, Chartered*, 669 A.2d 717, 720 (D.C. 1995) (quoting *United States v. Kucik*, 844 F.2d 493, 498 (7th Cir.1988)) (internal quotation marks omitted). None of the cases cited in the previous paragraph considered an argument that earning capacity and income are *always* the same. Three simply assumed that "earned income" and "earning capacity" were the same in those cases, apparently because the parties made that assumption as well. *See Zoglio I*, 626 A.2d at 905; *Ridge*, 511 A.2d at 420-21; *Roberts*, 412 A.2d at 48-50. That is hardly surprising: income will typically be the "best evidence" of earning capacity. *Dent*, 158 A.3d at 902 (quoting Larson, *supra*, at 525). *McMullen* comes somewhat closer, as it did address the meaning of "earning capacity." In that case, the petitioner argued that, even though his income had risen above the statutory threshold for termination, the PFRRB had discretion not to terminate his annuity by finding that his "earning capacity" was lower than his income. 465 A.2d at 366. The court rejected that argument, which was obviously inconsistent with the text of the statute. *See id.* Ultimately, however, *McMullen* merely stands for the obvious proposition that income above the statutory threshold is sufficient to establish "earning capacity" for the purpose of terminating

benefits.  *McMullen* says nothing about how to interpret "earning capacity" when considering an application to reestablish benefits.

Zoglio also makes various policy arguments that, in his view, suggest that the Secretary's interpretation was unreasonable.  *See, e.g.*, Pl.'s Reply at 5-6.  For example, he argues that a rule separating "earning capacity" from "earned income" "is meaningless and incapable of practical application."  *Id.* at 5.  The Court disagrees.  The Secretary's approach is workable, at least in cases where there is evidence that the applicant voluntarily chose not to work.

Zoglio makes two final points.  First, he argues that the Secretary has acted in "bad faith."  *Id.* at 21.  However, he does not explain how this is relevant to the statutory construction issue before the Court.  While it is certainly regrettable that the DCRB initially mishandled his case, Zoglio has not shown that he should therefore receive benefits to which he may not be entitled.  Second, he argues that the Secretary has unlawfully discriminated against him based on his age.  *Id.* at 20.  Here, too, it is unclear how this is relevant; Zoglio has not asserted an equal-protection claim in his complaint.  *See* ECF No. 1.  In any event, this theory is meritless.  It is true that D.C. Code § 5-714(a)(1) provides that, once an annuitant has reached the age of 50, his benefits can no longer be terminated.  But as the *Zoglio I* court explained, there are several rational bases that could plausibly support this classification, meaning that it does not run afoul of the Equal Protection Clause.  *See* 626 A.2d at 907-08.  And in any event, the termination provision is irrelevant to this case.  Zoglio's benefits were terminated over 30 years ago.  His real complaint is that the reestablishment clause in the statute does not make special provision for persons who have made it to retirement age.  Zoglio is not so much complaining about age discrimination as seeking more of it.

Thus, Zoglio's challenge to the Secretary's interpretation of the statute fails.

As noted above, Zoglio appears to base his entire challenge to the Secretary's decision to deny reestablishing his annuity on this question of statutory interpretation. In other words, nowhere does he argue that the Secretary's decision was arbitrary and capricious (or otherwise contrary to law) even if—as the Court has found—the Secretary reasonably determined that "earning capacity" and "earned income" have different meanings under the statute. Certainly, his motion papers do not clearly articulate any such challenge. And that is consistent with his position before the agency, where he put all his "earning capacity" eggs in the "earned income" basket. In every submission to ODCP, Zoglio rested his case solely on his earned income, without addressing the possibility that it might not fully reflect his earning capacity. JA 9, 15, 96, 113. In fact, he expressly argued that ODCP, by virtue of having received his "income information," had "all the relevant information it need[ed] to make a decision." JA 9.

Thus, the Court concludes that the Secretary acted reasonably in determining that Zoglio's income evidence was insufficient to demonstrate a loss of his "earning capacity." The record contains numerous indications that Zoglio's income might understate his earning capacity. First, the PFRRB had previously terminated Zoglio's benefits based on the revenues of his law firm, which were generated in substantial part by his own work as an attorney. JA 270-85. Second, Zoglio's submissions indicated that his law firm remained a going concern: attorneys at the firm continued to generate "legal work and fees" and "on occasion consult[ed]" with him. JA 15. His wife also earned a modest salary for "administrative work" there. *Id.* Based on this unrebutted evidence, the Secretary reasonably could conclude, and did conclude, that Zoglio's demonstrated "earned income" was insufficient to establish "earning capacity," because he could well have continued working as an attorney. JA 1, 7. To be sure, Zoglio pointed out that "he was almost 80 years old," JA 15, and also asserted that "his law firm did not make a profit in

2014," JA 114.  But Zoglio never argued that his advanced age had forced him to retire, or that his law firm could not have generated profits for him had he continued to work.

The Court notes the narrowness of its decision.  It concludes that, in this case, the Secretary reasonably found that Zoglio did not establish that a reduced "earning capacity" warranted reestablishment of his disability annuity under D.C. Code § 5-714(a)(2).  The Court does not reach the Secretary's two other theories about how to interpret D.C. Code § 5-714: that an applicant for reestablishment must also show that he remains disabled, and that the applicant's disability must be the cause for any loss in earning capacity.

Finally, the Court notes that its ruling does not necessarily mean that Zoglio will be forever left without a disability annuity.  It may well be that his advanced age and other facts could support an argument that his earning capacity has declined.  He simply has not made that argument.  The Secretary has represented that Zoglio "is not precluded from filing a claim in the future should the necessary conditions arise."  Def.'s Br. at 6 n.7 (citing JA 1).  The Court has no reason to doubt that, if Zoglio re-applies for reestablishment of his annuity, the DCRB and ODCP will fully and fairly evaluate his application.

V.    **Conclusion**

For all of the above reasons, the Court will grant the Secretary's motion, deny Zoglio's motion, and enter judgment in the Secretary's favor, in a separate order.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: October 4, 2018